RENDERED:  FEBRUARY 28, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0264-MR

SUSAN CARTER; MICHAEL
NICHOLS; AND STEPHEN NEWTON
NICHOLS                                                     APPELLANTS


APPEAL FROM OLDHAM CIRCUIT COURT
v.          HONORABLE JERRY D. CROSBY, II, JUDGE
ACTION NO. 22-CI-00577


SEAN P. PARIS, AS PUBLIC
ADMINISTRATOR OF THE ESTATE
OF JOHN W. NICHOLS, III; BRIAN
A. PARRISH; RENA E. PARRISH;
AND RITA RUNAE HERZOG                                        APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ECKERLE AND A. JONES, JUDGES.

JONES, A., JUDGE:  Susan Carter, Michael Nichols, and Stephen Newton Nichols

(collectively "the Siblings") appeal an order of the Oldham Circuit Court directing

them to execute a release required by a settlement agreement entered on their behalf by their former attorney. The Siblings contend the circuit court's order was in error because their former attorney lacked authority to bind them to the settlement agreement. Upon review, we affirm.

## I. BACKGROUND

John Warren Nichols III died intestate on December 24, 2021. Roughly a year later, John's estate ("Estate") filed suit against Brian and Rena Parrish, who owned property in La Grange, Kentucky, contiguous to John's residence. In its complaint, the Estate noted John had granted Brian Parrish a durable power of attorney ("POA") on November 30, 2021; and that Brian Parrish, two days before John's passing, and in his role as John's power of attorney, had deeded himself 2.5 acres of John's contiguous property. It alleged that Brian Parrish and Rena Parrish (to whom Brian later deeded joint ownership of the property) had only acquired John's 2.5 acres through misuse of the POA and asserted claims against them for breach of fiduciary duty and for the imposition of a constructive trust. The Siblings, who were beneficiaries of the Estate, were also named as parties to the suit.

The sole issue presented in this appeal is whether the Siblings' prior attorney, T. Scott Abell, had the Siblings' actual or express authority to settle their interests in this litigation when he purported to do so on their behalf on April 27,

-2-

2023. On that date, the parties (except Michael Nichols) and their respective counsel attended a mediation. The Nichols siblings in attendance left the mediation earlier than the others because Stephen needed to go home and take his heart medication. During their absence, but prior to the conclusion of the mediation, Abell executed the settlement agreement mentioned at the onset as their authorized representative.

In relevant part, the agreement provided that the Parrishes would pay the Estate $35,000. In exchange, the Parrishes would retain the contested 2.5 acres; the Parrishes, Estate, and Siblings would release one another from all claims stemming from the litigation; the mediation fees would be evenly split between the Parrishes and the Estate; and the parties would "sanitize the court record by redacting, withdrawing, or otherwise amending any references in any of the pleadings that tend to impair or affect the Parrish Defendants' reputation in the community."

When a release consistent with the April 27, 2023 agreement was presented to the Siblings a few days later, the Siblings refused to sign it, asserting their attorney, Abell, had lacked their authorization. Abell, who (correctly) predicted the Siblings' assertion would eventually require him to testify as a witness regarding the scope of his authority to act on their behalf, withdrew from further representing the Siblings. The Estate sought a declaration of rights from

the circuit court, asking it to resolve whether Abell had express or actual authority to bind the Siblings to the agreement. Following a November 1, 2023 evidentiary hearing on the issue, the circuit court entered a final order determining that Abell had indeed been so authorized, and that the agreement was enforceable. This appeal followed.

## II. STANDARD OF REVIEW

"[I]n the event of a dispute as to whether the client has given settlement authority [to their attorney], the trial court shall summarily decide the facts. In such a proceeding, the attorney-client privilege would not prevent the attorney from testifying as to the client's instructions regarding settlement." *Clark v. Burden*, 917 S.W.2d 574, 577 (Ky. 1996) (citation omitted). In making its decision,

> The trial court must determine whether appellant gave her attorney express or actual authority to settle the case . . . . If the court finds that such authority was given, the settlement should be enforced. Even if the trial court finds that no such authority was given, if it should also find that appellees were substantially and adversely affected by their reliance upon the purported settlement, enforcement would be appropriate. On failure to find one or the other of the circumstances set forth hereinabove, the court should determine that no settlement came into existence.

-4-

*Id*. (citation omitted).  We review questions of law *de novo*.  We review the circuit

court's findings of fact under the clearly erroneous rule of CR[1] 52.01.

### III. ANALYSIS

The evidence adduced regarding what transpired during the

mediation, what transpired prior to the execution of the agreement, and the scope

of Abell's express or actual authority primarily derived from the recollections of

Abell and Stephen Nichols, the only parties who testified at the evidentiary

hearing.  Abell, under questioning from the circuit court, described what occurred

at the April 27, 2023 mediation, as well as what he understood regarding the scope

of his settlement authority, in relevant part as follows:

> ABELL:  This was an all-day mediation.  It lasted about
> nine hours.  And it ended about 7:00 p.m.  Retired Judge
> David Bowles served as the mediator.  This mediation
> occurred at the end of April, the 27th or the 28th at the
> office of Sean Paris.  Throughout the day, Mr. Paris,
> Susan Carter, and Steve Nichols sat with me in a room
> adjacent to Mr. Paris' office, and we had many
> discussions about settlement.  At the end, we had
> agreement to settle for $35,000.  We had some drafts that
> were circulated, and I became irritated at one of the
> drafts, which I thought it asserted some things that
> weren't discussed, and I reacted.  And I looked around,
> and Susan and Mike[2] had left.  After that, I spoke with
> Susan and Mike by telephone.  We had discussions, and
> the agreement that I signed was signed with authority

---

[1] Kentucky Rule of Civil Procedure.

[2] Abell referenced "Mike" through an apparent mistake.  Stephen and Susan were the only
Nichols siblings who physically attended the mediation.

from Susan and Steve. I also spoke – and I believe they were on speaker phone – I spoke with Mike Nichols, who was not present, and he had agreed to do whatever Susan and, and Steve would do. And I went over the settlement terms with them. In princip[le], this was a $35,000 settlement. The real party in interest, says the Court, was Mr. Paris. And Mr. Oyler, on behalf of Mr. Parrish, had wanted the Nichols Siblings to sign off on this. So that, that's what happened that day. It was a grueling, long day. Everything was explained. Steve and, and Susan were there during the entire day. And we had many, many conversations. I most certainly had authority to sign what I signed. As to whether or not it's an enforceable agreement, that's, that's another question. But I certainly had authority to sign what I signed that day.

COURT: Okay. And so that was going to be my next question: Did you have express or actual authority, if there's a difference between those two, to enter into this agreement?

ABELL: Yes, express.

Nov. 1, 2023 hearing (Hearing) at 10:40:10 - 10:42:41; transcript at 25-26.

COURT: And was that – was – did – had [Stephen and Susan Nichols] left before you all had reached the $35,000 amount?

ABELL: No, the $35,000 was already agreed upon. There were some other terms that were – I, I believe it was – and this was a long, grueling mediation.

COURT: Yes, sir.

ABELL: But I remember the draft that I had received before they left was [in]consistent with our discussions, and I reacted to that. I became very irritated, and they left. But what we ultimately agreed to, I believe, was the

same as before they left. And, certainly, I talked with them by telephone. They were in the car together when I spoke with them, and they authorized this.

COURT: Were they allowed to participate in the mediation? Meaning, were their thoughts or concerns conveyed either through you, or directly by themselves to the mediator, or to other parties that participated in the mediation?

ABELL: Yes, Susan and Steve participated greatly in the mediation. Mike was not there, but Mike said he'll do whatever – at first he was reluctant, but he would agree to do whatever Susan and Steve wanted to do. I believe I have an e-mail that – in which he stated that.

COURT: In the course of your – these discussions with – and during mediation, how did the figure of $35,000 come about?

ABELL: Well I believe the negotiations began at $65,000 or so. Mr. Paris had obtained a couple of appraisals. One appraisal was around $45,000, and that was just for the sliver of property itself. And then the, the second appraisal factored in the diminished value of the adjacent property, which has since been sold. Those were the original amounts as I recall. Mr. – Judge Bowles would have probably those, those numbers. But ultimately, there was some back and forth negotiation after a long day, and the $35,000 figure was agreed upon.

COURT: Was there any objection from either of the Nichols Siblings to that $35,000 negotiated price for this 2.4 [sic] acres of property that had been deeded to the Parrishes?

ABELL: They didn't like it, but they agreed to it.

COURT: Okay.

ABELL: They, they felt that Mr. Parrish was getting off easy, what they understood, and we discussed at length the practical considerations, including the cost of the proceeding. And so they did agree to that. But they did not like it. But my experience with mediation is most people are squealing when they leave the room. It's a compromise.

COURT: Sometime after the siblings left, you stayed and you said you – they left, Mr. Paris indicated they may have left between 4:30 and five o'clock, and that you indicated you were there maybe until seven o'clock?

ABELL: I believe they were there longer than 4:30 or 5:00. But we did stay at least an hour, hour and a half after.

COURT: Okay.

ABELL: I know there was a strong desire to try to resolve this dispute. This is a gruel – as the Court knows, a very involved, complex, and contentious set of cases.[3]

COURT: Was there anything that was added or taken away from the agreement, specifically surrounding that $35,000 that was made after the time the two siblings departed from the room?

ABELL: The only thing that could have changed, and I have to recall, is the amount of attorney fees. Certainly, we discussed at the beginning of the mediation a number. Not at the beginning, but at some point midway through, a number, and I, I don't recall what it was. But that number did increase because we had been there longer. I don't recall specifically I knew that the attorney fees

---

[3] The Siblings also intervened in a related proceeding that the Estate initiated against Rita Runae Herzog to annul what was allegedly Herzog's invalid marriage to John – a marriage that had occurred days before John's death. *See Carter v. Paris*, No. 2023-CA-0644-MR, 2024 WL 3381151 (Ky. App. Jul. 12, 2024) (unpublished; cited only for context).

were going to be paid by the [E]state, and the mediation was going to be paid, or shared between Mr. Paris and Mr. Parrish, even though my clients participated, they weren't having to share any of the mediation expense directly. I believe that every term was the same except there could have been a change in the number relating to attorney fees. That would be the only thing that I recall.

Hearing at 10:43:39 – 10:49:07; transcript at 27 – 30.

Upon further questioning from the parties, Abell acknowledged that the day after the mediation, the Siblings told him they were displeased that he had entered into the settlement agreement on their behalf without first showing them the final, written product: "[The Siblings] weren't happy. They were not happy. 'We're – we – in the future, you know, we need to see this.' They were not happy, and they expressed that the day after. I thought that they just had some confusion about the terms, but they were not happy."[4] But, Abell added that he has never in his 28 years of practice settled a case without his client's authorization; and, while the Siblings had not seen the agreement before he had executed it on their behalf, he maintained that he had express authorization from all three Siblings to enter the agreement.[5] He testified the agreement contained the same negotiated terms that he had discussed with the Siblings and had gotten their authority to consent to prior

---

[4] Hearing at 11:13:00 – 11:13:16; transcript at 49.

[5] Hearing at 10:58:55 – 10:59:14; transcript at 39.

to when the Siblings had left the mediation;[6] that prior to when the final, written document was drafted and he executed it on behalf of the Siblings, he had a ten or fifteen minute telephone conversation with Stephen and Susan (who were driving home together from the mediation) to review those terms and "make sure they were still onboard;"[7] and that he had secured their consent and express authorization to enter the agreement during that phone call.[8]

Stephen Nichols, for his part, denied that he and his siblings had authorized Abell to enter the agreement, and stated that they were "shocked" when Abell presented the already-executed agreement to them the day after the mediation.[9] He testified that when Abell had called him and Susan during their drive back from the mediation, he had not consented to anything, but had instead merely told his sister to tell Abell that he couldn't "deal with this right now, I need to get my medication."[10] He believed he had expressed to Abell that he and his siblings were not comfortable signing the agreement until a written, finalized

---

[6] Hearing at 11:21:50 – 11:24:33; transcript at 53-55.

[7] Hearing at 11:25:11 – 11:25:39; transcript at 56.

[8] Hearing at 11:28:16 – 11:28:18; transcript at 58.

[9] Hearing at 11:53:30 – 11:53:40; transcript at 77.

[10] Hearing at 11:53:00 – 11:53:13; transcript at 76.

version was presented to them.[11]  He testified Abell should have known, in particular, that he and his siblings objected to the "sanitation clause" that had ultimately been added to the agreement.[12]

Regarding whether Abell had told them during their drive home from the mediation that he intended to execute the agreement on behalf of the Siblings, Stephen testified:  "I did not hear that part of it, Susan was talking to him on the phone."[13]  Stephen testified that Abell should have known, during the negotiations, that he and his siblings wanted the 2.5 acres to be returned to the Estate, and for the Parrishes to pay their attorney's fees.[14]  However, Stephen acknowledged he and Susan had participated in the settlement negotiations during the mediation, had "a little bit" of give and take with the mediator,[15] and that he and his siblings had been aware of almost all of the terms that had been offered and had ultimately become part of the agreement (*i.e.*, the sanitation clause, the $35,000 settlement figure to be paid by the Parrishes for the 2.5 acre tract, and that part of the settlement would go toward paying the Estate's attorney's fees), as well as some of the factors

---

[11] Hearing at 11:54:34 – 11:54:55; transcript at 77 – 78.

[12] Hearing at 11:56:45 – 11:57:07; transcript at 79.

[13] Hearing at 11:57:41 – 11:57:54; transcript at 80.

[14] Hearing at 11:55:16 – 11:55:26; transcript at 78.

[15] Hearing at 12:01:00 – 12:01:26; transcript at 82 – 83.

underpinning those terms (*i.e.*, that the 2.5 acres had been appraised at $65,000, but that taking the litigation to trial would precipitate additional costs and attorney's fees).[16]

In its dispositive order, the circuit court summarized Abell's and Stephen Nichols' testimony and held in relevant part as follows:

> [T]his Court finds that Attorney Abell had his client's express authority to enter into the settlement agreement and further, that a settlement of the matter was achieved via the use of a mediator. The Court notes that the testimony demonstrated that the Nichols Siblings were present throughout the discussions and were present when a consensus offer was conveyed for settlement. The Court finds the Nichols Siblings accepted the agreement and gave Attorney Abell authority to enter the agreement. The documents were not prepared until after the Nichols Siblings departed, but the settlement agreement reflects the oral agreement they entered into through their attorney.
>
> "If the court finds that such [express] authority was given, the settlement should be enforced." *Clark*, [917 S.W.2d] at 577.
>
> The Court firmly believes the Nichols Siblings gave Attorney Abell express authority to enter into the agreement. The Court is also encouraged by the aspirations asserted by [the] Court in [the] *Clark* opinion:
>
> > We are not unconcerned with the possibility that this decision will alter an essential component of the administration of justice, the settlement of civil lawsuits. We have considered the argument that lawyers must

---

[16] Hearing at 12:02:08 – 12:03:53; transcript at 83 – 85.

be able to have complete trust in the representations of other lawyers with respect to settlement. We understand that one who is unscrupulous might attempt to gain a negotiating advantage by making, but later disavowing, a settlement offer or acceptance. *We are comforted, however, in the knowledge that the vast majority of all Kentucky lawyers are entirely ethical. Regardless of what we say here, those lawyers would not think of settling a case without express client authority and certainly would not attempt to gain an advantage by unscrupulous negotiating tactics.* Practicing lawyers (and judges) soon learn who among their colleagues lack trustworthiness and deal with them accordingly. In all but the rarest of circumstances, the settlement practices which have heretofore prevailed will continue. [emphasis added].

*Id.*

On appeal, the Siblings argue the circuit court clearly erred in determining the settlement agreement was enforceable because, in their view, no evidence of any substance supported it. We disagree. Considering what is set forth above, the issue before us does not involve the *absence* of evidence, but rather the circuit court's *weighing* of the evidence. This case turned entirely upon opposing testimony offered by Abell and Stephen Nichols, respectively, regarding whether Abell did or did not have express, actual authority to enter the settlement agreement on behalf of the Siblings. Abell's testimony supported that he had the

-13-

requisite authority, and it qualified as substantial evidence.  The circuit court found Abell's testimony more credible than Stephen's testimony, and it was the circuit court's prerogative as the fact finder to weigh the evidence and the credibility of the witnesses presenting it.  *See M.P.S. v. Cabinet for Human Res.*, 979 S.W.2d 114 (Ky. App. 1998).  Accordingly, we find no error.  The circuit court's decision will not be disturbed.

## IV. CONCLUSION

We AFFIRM the judgment of the Oldham Circuit Court for the reasons discussed above.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Michael A. Valenti
Dylan V. Valenti
Louisville, Kentucky

BRIEF FOR APPELLEE, SEAN P. PARIS, AS PUBLIC ADMINISTRATOR OF THE ESTATE OF JOHN W. NICHOLS, III:

Sean P. Paris
La Grange, Kentucky

BRIEF FOR APPELLEES, BRIAN AND RENA PARRISH:

Daniel M. Oyler
Louisville, Kentucky